The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Haigh. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following as set forth herein as:
 STIPULATIONS
The jurisdictional matters set forth in the parties' Pre-Trial Agreement dated July 11, 1996 are incorporated herein as conclusions of law. Subsequent to the hearing, the parties stipulated into evidence the following documents: one packet of plaintiff's medical records relating to treatment prior to October 18, 1994; one packet of plaintiff's medical records relating to treatment after October 18, 1994; a two page Form No. 22 dated July 15, 1996; and a two page Accident Investigation Report dated October 25, and October 27, 1994. Plaintiff's claim involves an alleged specific traumatic incident occurring on October 18, 1994.
 EVIDENTIARY MATTERS
The objections raised by counsel during the depositions are ruled upon in accordance with the law and the Opinion and Award in this case. Moreover, the Motion raised on page 9 in plaintiff's contentions is Denied. Said Motion has gone to the weight accorded the testimony of Dr. Osbahr as is allowed by the Supreme Court of North Carolina. See Crist v. Moffatt, 326 N.C. 326,389 S.E.2d 41 (1990) (at the second paragraph on page 330 and at the third paragraph on page 337).
 ***********
Based upon the Findings of Fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff, who is 50 years old, has a high school education and in 1990 took a course in computers at a technical school. Prior to her employment with defendant, she drove a school bus and she worked as a debit collection life insurance agent.
2. Plaintiff began working for defendant in 1977 and thereafter remained so employed through November 7, 1994. In about October 1993 she was transferred to a labor crew job where her duties included cleaning, shoveling, moving desks and heavy furniture, lifting concrete blocks, carrying boxes, and assembling and disassembling wooden as well as metal scaffolding. This job required her to walk, stand, climb, bend, reach, and lift weights up to approximately 100 pounds.
3. In March 1988, she underwent cervical fusion performed by Dr. Van Blaricom after which she did well and returned to work for defendant. In June 1992 she was examined and evaluated by Dr. Van Blaricom for chronic low back problems that had bothered her for several years and she was then having some radiation into her right hip and occasionally pain in the left hip which had not been helped recently by chiropractic treatment. In this regard, plaintiff related to Dr. Osbahr on November 2, 1994 that she had a motor vehicular accident in 1989 and had experienced back pain since that time. Dr. Van Blaricom prescribed epidural blocks, medications, and physical therapy for treatment of what x-rays showed was spondylolisthesis in the lumbar spine. Plaintiff obtained three weeks of relief from the treatment but then the pain returned as before and on August 17, 1992 he prescribed a medication and physical therapy. When next seen by Dr. Van Blaricom on March 2, 1994 for re-evaluation of her chronic low back problem she was having some pain in the low back all the time and occasional pain radiating into her left hip and thigh but not below the knee and the most bothersome area to plaintiff was her left sacroiliac joint. At that time, her symptomatology did not warrant surgical treatment but rather conservative care from Charles Warren, D.C. In April 1994, she was seen by Dr. Osbahr, a physician under contract with defendant, seeking a back support because of her ongoing back problems and the support was supplied at that time. Beginning in September 1992 and continuing through October 13, 1994, plaintiff was treated by Charles Warren, D.C., for various complaints, including pain in the neck, shoulder, low back, left hip, left leg, left groin, left buttock, left SI joint and bilateral SI joints. She was treated by him on approximately 80 occasions during that period with most of those visits being related to complaints of low back pain which often radiated to her hips. On occasion, her low back was painful and she was limping. As recent as October 13, 1994, she was seen by him for pain in the low back, SI, and left hip after having picked up and carried 53 boxes upstairs at work the previous day. Plaintiff's low back and hip pain thereafter improved prior to October 18, 1994.
5. Plaintiff had spinal stenosis (narrowing of the spinal canal) and spondylolisthesis (degenerative facet joint disease) at L4-L5 which not only preexisted October 18, 1994 but which also required medical treatment, primarily chiropractic, on a regular basis from 1992 to October 13, 1994. Because of those pre-existing conditions, she had an unstable back which was aggravated on numerous occasions by specific incidents/activities, such as bending and standing, and by accidents, such as falling and stepping in a hole, and while her initial treatments where mostly for "aches and pains", her problems gradually began to get worse by about June 1994.
6. Despite plaintiff's pre-existing conditions with episodic, recurrent exacerbation of her symptoms and the treatment rendered therefor, she continued to work to October 18, 1994 on a regular basis which included climbing and lifting heavy weights ranging up to approximately 100 pounds. Significantly, prior to October 18, 1994 she missed only one day from work, in January 1991, due to her low back conditions.
7. On the morning of October 18, 1994, plaintiff started work at 7:00 a.m. and she and two co-employees were engaged in the process of disassembling metal scaffolding which consisted of three sections. Plaintiff and one co-employee climbed the scaffolding to a height of about 15 to 18 feet and began taking apart the metal framing and handing those pieces and the wooden walk boards to the other co-employee who remained on the floor.
8. On one particular occasion at about 11:45 a.m. on that date, plaintiff was standing on the outside edge of the second section of the metal scaffolding with her feet being about 10 feet above the floor. While holding onto the scaffolding with her right arm and hand, she bent over to her left as far as she could and using her left hand, she lowered a piece of scaffolding to the co-employee on the floor. As she was lowering the piece of scaffolding, she experienced the onset of severe, sharp pain going from her low back into her left hip whereupon she told one of the two co-employees "Oh, I hurt my back." Plaintiff and the two co-employees thereafter finished disassembling and loading the scaffolding until the end of the shift but her pain continued and that evening, she was unable to sleep because of it. Her condition following the October 18, 1994 incident was much worse than it had been in the previous few months.
9. On October 19, 1994 plaintiff was assigned the job of helping pour a concrete floor. However, as she started to pull a hoe through a mixture of water and cement in a wheelbarrow in order to mix it, she could not do it because of the severity of her low back pain. She then went to defendant's medical section where she was seen by David Stegall, Dr. Osbahr's Physician's Assistant. She reported to him a history of low back pain and left leg pain since disassembling some scaffolding on October 18 and her back hurting the whole time. Following examination, which revealed tenderness in the left lower back and into the left buttock and hip, Stegall recommended light duty because of an acute exacerbation of her pre-existing degenerative disc disease. After plaintiff gave Stegall information, including how she was injured, for an accident report, she took it to Bobby Mease, her foreman. Mease then assigned her to light duty helping sweep and cleaning up but with no lifting or bending. During the ensuing two weeks plaintiff mostly pushed a broom.
10. Defendant's two page Accident Investigation Report, which was signed by plaintiff and Mease on October 25, 1994 and by A. E. Smith, Superintendent, on October 27, 1994 reflects, among other things, that on October 19, 1994 plaintiff reported that she had an "accident" at 11:45 a.m. on October 18, 1994 while taking down scaffolding and that she had worked 4 hours and 45 minutes prior to the "accident" which involved her left lower back. The undersigned accepts this recordation as credible and corroborative of the testimony of plaintiff and Fran Fenning concerning the onset of back pain at a specific point in time on October 18, 1994. The usage of the word "accident" in said report is interpreted by the undersigned to mean an "incident" rather a legal interpretation establishing an accident as defined under the Workers' Compensation Act.
11. Plaintiff was examined by Dr. Osbahr on October 26, 1994 with complaints of low back pain radiating to the left leg. He prescribed medications and placed her on light duty because of exacerbation of her pre-existing degenerative disc disease. An MRI on October 28, 1994 revealed moderate spinal stenosis at L4-L5 but no disc herniation.
12. Plaintiff was thereafter seen but not treated by chiropractor Warren in about late October at which time she related to him the recent exacerbation of her symptoms. Because chiropractor Warren assessed her symptomatology as being a lot worse, she really hurt a lot, worse than when he normally had seen her in the past, he referred her to Dr. Hoski. She was still experiencing exacerbation of her symptomatology when again seen by Dr. Osbahr on November 2, 1994.
13. After having pushed a broom for 2 weeks following October 18, plaintiff was transferred to a paper machine operator job which would have required lifting a lot of heavy paper as well as climbing, reaching, stretching, and pulling activities. For the first week following that transfer, plaintiff and other transferees went to school for one half of the day and then the remaining half of the day they watched other employees perform the job. Before plaintiff ever began to perform the job, Tracy Heckokowski (phonetic) told plaintiff that she did not think plaintiff should do those job duties because she may further hurt herself and she suggested that defendant put her out on disability. Plaintiff has not worked for wages since then and on November 7, 1994 she began receiving short-term disability benefits pursuant to defendant's wholly funded disability insurance policy.
14. On November 10, 1994, plaintiff came under the care of Dr. Hoski and received a series of lumbar epidural blocks for treatment of her exacerbated condition. Those epidural blocks only provided temporary relief and when seen on November 29, 1994 by Dr. Hoski, plaintiff was still having "good days and bad days." After prolonged standing and decorating her Christmas tree on or about December 6, 1994, plaintiff experienced an increase in her back pain. She was again seen by Dr. Hoski on December 8, 1994 and remained under his care through February 6, 1995.
15. On December 21, 1994 plaintiff advised chiropractor Warren that in December she had slipped and fallen on her right knee in her yard and had aggravated her low back. When seen by Dr. Osbahr on December 21, 1994 she continued to have chronic low back pain with exacerbation for which he prescribed physical therapy.
16. Plaintiff thereafter participated in physical therapy from January 4, 1995 through January 25, 1995. As early as January 6, however, she was unable to complete physical therapy that day due to increased low back pain. She thereafter remained in physical therapy through January 25, 1995 but she did so with increased back pain and pain radiating into her left leg. On January 23, 1995, she again experienced increased low back pain and, as of January 25, 1995, physical therapy was discontinued because there had been no progress.
17. Plaintiff presented to Dr. Osbahr on January 27, 1995 complaining that her pain had increased during physical therapy and, on examination, she had acute low back spasm which was a change from his previous findings on examinations of her and which was due to her exercising at the physical therapy program. By examination on February 1, 1995, she continued to have chronic low back pain with left leg radiation and she complained that the leg pain radiated into her toes. On that visit, plaintiff stated that she wanted to return to work because if she were converted from defendant's short-term disability program to its long-term disability program, the amount of her disability benefits would be significantly reduced.
18. Plaintiff was examined and evaluated by Dr. Weiss on May 12, 1995 upon referral from Dr. Osbahr, primarily because of pain in her left hip and leg. A subsequent lumbar myelogram and post myelographic CT revealed enlargement of the facet joints bilaterally at L4-L5 and narrowing of the spinal canal. There were very significant degenerative arthritic changes of the facet joints between L4-L5 which had resulted in enlargement of those facet joints and due primarily to that enlargement, there was spinal stenosis or narrowing of the space in the spinal canal where the nerve runs. In June 1995, she performed left L4-L5 laminotomy and medial facetectomy for treatment of left L4-L5 stenosis in order to remove pressure on the impinged nerve.
19. By July 19, 1995 plaintiff's radicular left hip and leg pain had completely gone, but she had experienced the onset of significant pain in the left lower back. Because of ongoing significant low back pain and some right hip pain, Dr. Weiss performed right L4-L5 decompressive laminotomy and bilateral L4-L5 fusion with implantation of a bone growth stimulator in October 1995 for treatment of degenerative spondylolisthesis and spinal stenosis at L4-L5, again in order to remove pressure from the impinged nerve. Postoperatively, plaintiff has not experienced much hip or leg symptomatology, but she has continued to experience significant bilateral low back pain. She was ultimately discharged from his care on July 16, 1996 and she may or may not continue to improve over the next year or year and one half.
20. On October 18, 1994 plaintiff sustained a specific traumatic incident of the work assigned which arose out of and in the course of her employment with defendant and which resulted in injury to her pre-existing spondylolisthesis and spinal stenosis and which further, when considered in conjunction with her age, education, and work experience, rendered her unable to earn any wages in any employment beginning November 7, 1994 and which ultimately resulted in the surgeries performed in June 1995 and October 1995. Although the causes of plaintiff's wage earning incapacity and the surgeries performed are multi-factorial, the specific traumatic incident which she experienced on October 18, 1994 significantly exacerbated her pre-existing lumbar spondylolisthesis and spinal stenosis and was thereby a significant causal factor of her wage earning incapacity and her surgeries. She has not reached the end of the healing period and is unable to engage in prolonged standing, prolonged sitting, frequent bending at the waist or heavy lifting.
21. As of October 18, 1994, plaintiff's average weekly wage amounted to at least $788.59 ($41,119.59 divided by 52 1/7 weeks). From November 7, 1994 through May 6, 1995, she received short-term disability benefits in the amount of $486.30 weekly pursuant to defendant's wholly funded disability insurance program. In addition, beginning May 8, 1995 and continuing through July 22, 1996, the date of the hearing, she received long term disability benefits in the amount of $102.06 weekly pursuant to defendant's wholly funded disability insurance program.
 ***********
Based upon the Findings of Fact found by the Deputy Commissioner, the Full Commission finds as follows:
 CONCLUSIONS OF LAW
1. On October 18, 1994 plaintiff sustained an injury by accident by way of a specific traumatic incident of the work assigned which arose out of and in the course of her employment with defendant and which resulted in a disabling back injury. Her average weekly wage amounts to at least $788.59, which yields the then applicable maximum compensation rate of $466.00 weekly. N.C. Gen. Stat. § 97-2 (5); N.C. Gen. Stat. § 97-2 (6); N.C. Gen. Stat. § 97-2 (9); and N.C. Gen. Stat. § 97-29.
2. As a result of the injury by accident, giving rise hereto plaintiff was rendered totally disabled beginning November 7, 1994 and she remained so disabled through September 22, 1996, the date of the hearing in this case before the Deputy Commissioner. She accordingly is entitled to compensation benefits at the rate of $466.00 weekly beginning November 7, 1994 and continuing thereafter until further Order of the Commission, less a credit to which defendant is entitled to in the amount of $486.30 per week for the period from November 7, 1994 through May 6, 1995 and a credit in the amount of $102.06 per week from May 8, 1995 through September 22, 1996 and continuing thereafter for so long as she continues to receive long term disability benefits pursuant to defendant's wholly funded disability insurance program. N.C. Gen. Stat. § 97-2 (9); N.C. Gen. Stat. § 97-29; and N.C. Gen. Stat. § 97-42.
3. Plaintiff has not reached the end of the healing period but rather may or may not continue to improve. Defendant is responsible for medical compensation incurred or to be incurred, including vocational rehabilitation services when and if those services are warranted, for treatment of the injury by accident giving rise hereto. N.C. Gen. Stat. § 97-2 (19); N.C. Gen. Stat. § 97-25; and N.C. Gen. Stat. § 97-31.
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to counsel fee hereinafter approved, and after application of credit to which defendant is entitled to and will be in the future so long as it continues plaintiff's long term disability benefits, defendant shall pay to plaintiff compensation benefits at the rate of $466.00 per week beginning May 8, 1995 and continuing thereafter until further Order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum without commutation.
2. A reasonable attorney fee in the amount of twenty-five percent of the accrued benefits and of benefits which hereafter accrue under the terms of this Opinion and Award is hereby approved for plaintiff's counsel. Said twenty five percent attorney fee shall be deducted from the compensation otherwise payable to plaintiff and shall be paid directly to her attorney.
3. Defendant shall pay medical compensation incurred or to be incurred, including vocation rehabilitation services if and when warranted, for treatment of the injury by accident giving rise hereto when the expense for the same shall have been approved as by law provided.
4. Defendant shall pay the costs, including an expert witness fee in the amount of $90.00 to David Stegall, PA, and in the amount of $250.00 to Dr. Osbahr.
This _____ day of June 1998.
 S/ _________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ _______________________ CHRISTOPHER SCOTT COMMISSIONER
DCS/jlr